O'LOUGHLIN *v.* DETROIT AND MACKINAC
RAILWAY COMPANY

1. WITNESSES—EXPERT WITNESSES—QUALIFICATION—DISCRETION.
   The determination of the qualifications of an expert witness is a matter within the discretion of the trial judge, and the Court of Appeals will interfere only to correct an abuse of discretion.

2. WITNESSES—EXPERT WITNESSES—CHEMIST—QUALIFICATIONS.
   A witness with a degree in chemistry who has worked approximately 23 years in the chemical and pharmaceutical field, and who has 12 years' experience in analyzing blood samples and conducting and analyzing various alcohol experiments is an expert regarding the effects of alcohol upon drivers, and exclusion of his testimony about those effects was error in a case where plaintiff's decedent had 0.15% alcohol in his blood when he died in a car-train collision.

3. PLEADING—DEFENSES—AFFIRMATIVE DEFENSES—INTOXICATION—CAUSATION.
   Intoxication is an affirmative defense in a negligence action only if the plaintiff's state of intoxication was causally connected with the accident in suit.

4. NEGLIGENCE—RAILROADS—INTOXICATION—CAUSALITY.
   A decedent's state of intoxication was not causally connected with an automobile-train accident at the crossing where witnesses could barely see the train 135 feet from the crossing and twice that distance is needed to come to a safe stop, an electric flasher signal equipped with lights and bells at the crossing was not

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur 2d, Expert and Opinion Evidence § 26.
[2] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 331, 332.
[3] 8 Am Jur 2d, Automobiles and Highway Traffic § 938.
[4] 44 Am Jur, Railroads §§ 505, 534.
[5] 44 Am Jur, Railroads § 528.
[6, 7] 44 Am Jur, Railroads § 563.
[8] 22 Am Jur 2d, Damages §§ 53, 88, 368.

operating when the train crossed the highway, testimony tended to show that decedent was travelling at or under the legal speed limit, and where the physical evidence showed that the decedent probably saw the train approximately 160 feet from the crossing and applied his brakes, leaving skid marks for the last 102 feet.

5. Railroads—Crossing Sign—Notice.

The existence of a railroad crossing sign located 500 feet from a crossing is not sufficient to put an automobile driver on notice that a train is crossing the highway.

6. Railroads—Negligence—Electric Signal—Familiarity—Reliance.

A resident of an area in which a train crosses a highway has the right to rely upon an electric flashing signal which he knows is at the crossing, and the existence of a standard crossbuck sign 500 feet from the crossing does not reduce the reliance he could place upon the electric flasher but could serve as a warning to be on guard for the electric flasher.

7. Railroads—Protected Crossing—Reliance.

At a protected highway crossing, one may place reliance on the protection afforded at the crossing and expect an electric flashing signal to operate when a train is crossing the highway.

8. Judgment—Substantive Change—Future Earnings—Income Taxes—Evidence.

Whether a trial court may take into account income tax consequences in figuring an award of damages for loss of future earnings is expressly reserved for decision in a case where the issue is properly presented, but in any event a trial court may not make a substantive change in a judgment which includes loss of future earnings by considering the element of future income taxes, which had not been previously taken into consideration, unless it is done according to evidence presented.

Appeal from Alpena, Donald L. Munro, J. Submitted Division 3 November 6, 1969, at Detroit. (Docket No. 6,149.) Decided February 25, 1970. Leave to appeal denied May 20, 1970. 383 Mich 784.

Complaint by Lutie O'Loughlin, administratrix of the estate of Terrence M. O'Loughlin, against the

Detroit and Mackinac Railway Company for damages resulting from an automobile-train accident. Judgment for plaintiff, later reduced *sua sponte* by the court. Defendant appeals. Plaintiff cross-appeals. Modified, affirmed as modified, and remanded.

*Walker, Stenglein, Troester, Picard & Fordney* and *Michael N. Freel,* for plaintiff.

*Dyer, Meek, Ruegsegger & Bullard (Barry L. King,* of counsel), for defendant.

Before: LESINSKI, C. J., and HOLBROOK and QUINN, JJ.

LESINSKI, C. J. Lutie O'Loughlin, widow of Terrence O'Loughlin, as administratrix of his estate, brought suit under the Wrongful Death Act[1] to recover damages from defendant Detroit and Mackinac Railway Company. The trial court sitting without a jury awarded plaintiff damages of $100,-000. On its own motion the court reduced the recovery to $88,000. From this judgment defendant appeals and plaintiff cross-appeals.

At approximately 1:30 a.m. on October 3, 1963, plaintiff's decedent[2] was fatally injured when the car which he was driving collided with defendant's freight train at a crossing on US 23 near Ossineke in Alpena County. O'Loughlin died without regaining consciousness.

Defendant raises two issues on appeal. First, whether the trial court was clearly in error in failing to find O'Loughlin guilty of contributory negligence. Second, whether the trial court committed reversible

---

[1] MCLA § 600.2922 (Stat Ann 1969 Cum Supp § 27A.2922).
[2] Hereinafter also referred to as O'Loughlin.

error in refusing to allow defendant's witness, a chemist and toxicologist, to testify as an expert on the significance of 0.15% by weight of alcohol in O'Loughlin's blood. We address ourselves to these questions in reverse order.

At trial defendant offered Alvah Gatrell, a toxicologist and chemist employed by the crime detection laboratory of the Michigan Department of Health, as an expert witness. After establishing that Mr. Gatrell analyzed the blood sample removed from decedent immediately after the accident and that the sample contained 0.15% alcohol, defendant asked the following question: "And Mr. Gatrell, what is the significance of that finding?" The answer to this question was objected to[3] on the ground that the witness was not qualified to testify as to the effects of the stated amount of alcohol in a person's bloodstream.

That the determination of the qualifications of an expert is a matter within the discretion of the trial judge, to be interfered with only to correct an abuse, is settled law in this State. *People* v. *Hawthorne* (1940), 293 Mich 15.

However, in this case we find that the trial judge abused his discretion in limiting the scope of this expert's testimony. Mr. Gatrell testified that he received a degree in chemistry from Michigan State University (then College) in 1928. Subsequently he worked approximately 23 years in the chemical pharmaceutical field. He held various supervisory positions during that period. For the 13 years before the trial, he was employed by the Department of Health, spending 12 years in the crime laboratory. At the laboratory he worked with 12 physicians analyzing blood samples and observing various test

---

[3] The witness' answer, made prior to objection, was: "He would definitely be under the influence of alcohol."

situations involving alcohol experiments. He also testified that he assisted two students of the Michigan State University Police Administration School in a 13-week experiment studying the effect of alcohol upon drivers. It appears Mr. Gatrell aided in the conduct *and analysis* of the various experiments. In addition, it appears Mr. Gatrell assisted in various other similar experiments during his tenure at the laboratory. Similar testimony has been given by chemists in other jurisdictions, even in trials before juries, which is not this case. *DeSalvatore v. State* (1960), 52 Del 550 (163 A2d 244); *Commonwealth v. Capalbo* (1941), 308 Mass 376 (32 NE2d 225); *People v. Markham* (1957), 153 Cal App 2d 260 (314 P2d 217); *State v. Libby* (1957), 153 Me 1 (133 A2d 877). See generally, annotation, 77 ALR 2d 971.

The trial court should have had the benefit of Mr. Gatrell's expert testimony before attempting to arrive at a conclusion. Failure to admit the testimony was clearly erroneous.

The question, therefore, turns to whether the error was prejudicial.[4] We conclude, for two reasons, that it was not.

First, the trial court took notice of MCLA § 257.625a (Stat Ann 1968 Rev § 9.2325[1]), and began its factual determination of the case with the presumption that since O'Loughlin's blood test showed 0.15% alcohol by weight, he was under the influence.[5] The testimony of defendant's expert could add little to this. Lacking firsthand knowledge of how alcohol affected O'Loughlin's ability (as a particular individual) to drive, all the expert

---

[4] See generally, 2 MLP, Appeal, § 461, pp 408, 409.

[5] On the issue of whether MCLA § 257.625a (Stat Ann 1968 Rev § 9.2325[1]), applies to civil suits, we specifically reserve judgment for another case. We simply note here that as a factual matter the trial court did give defendant the benefit of the presumption.

could have provided was certain statistical averages and generalities as to how people are effected by given amounts of alcohol. This testimony could have been met, just as the presumption was met, by competent evidence.

Second, intoxication is a defense in the instant case only if it was causally related to the accident. In this regard the trial court found: "Under all the circumstances here existing the train was not visible to plaintiff's decedent nor would it have been visible to an *ordinarily prudent driver.*" (Emphasis supplied.)

Effectively the trial court found that defendant's negligence had made the train so difficult to see on the night of the accident that even a person not under the influence (*i.e.,* the ordinarily prudent driver) would not have seen it in time to avoid a collision. If this finding is not clearly erroneous,[6] then O'Loughlin's state of intoxication was not causally connected with the accident.

We must, therefore, consider defendant's argument that the trial court's failure to find O'Loughlin contributorily negligent was clearly erroneous.

Defendant points to several factors tending to indicate contributory negligence. O'Loughlin was driving at a speed of 50 to 60 miles an hour with his low beam lights although the night was dark and misty. He had 0.15% by weight of alcohol in his blood. He made no visible effort to avoid the collision until he was 135 feet from the crossing. A railroad crossing sign was located 500 feet in advance of the crossing.

While these points are true the record does reveal sufficient evidence to absolve O'Loughlin of an allegation of contributory negligence. The night of

---

6 Its soundness will be discussed below.

the accident was overcast and misty. It had been raining off and on earlier in the evening. Although an electric flasher signal, equipped with lights and bells, existed at the crossing, both eyewitnesses testified that it was not operating when the train in question was crossing US 23.[7]

Moreover, the witnesses, who viewed the entire accident from a crossroad 135 feet north of the railroad crossing, described the train as "dark" and of a "dull color." They testified: "You couldn't see it too well," and "I could barely see the train. It was kind of like a shadow going across a track or a street."[8]

Evidence was introduced, however, which tended to prove that the total stopping distance at 45 miles per hour is 186 feet and at 55 miles per hour 291 feet under ideal conditions. The record indicates that the

---

[7] Mr. Bernard Dalton, one of the two eyewitnesses, testified:

"Q. O.K. Then what happened?

"A. I started to pull out right away and then I thought there wasn't any sense in it, because the train was there, and I would have to wait anyway, so I would just wait for the car to come and I looked up and looked—and it looked to me like he had plenty of time to stop and I was sitting there and about the time he got in front of us, I realized that he hadn't even seen the train and wasn't able to see anything at all and it just hit me all of a sudden that he didn't see it. There wasn't any way to see it. I had, before, earlier—when we came to the first crossing down South Ossineke Road and the railroad, there was no flashing or anything and being almost hit by the train I made a remark to myself and wife both that they should have a flasher there because a guy could get killed and I turned right and came to the intersection of Piper Road and US 23 and I turned to her and I said, 'Well, they don't have one here, either.'

"Q. Now, at that time, you heard no bells?

"A. Well, I may have heard a bell on the engine, maybe, but it wasn't a bell of a signal or anything.

"Q. Did you observe any flashers at that time?

"A. No, there wasn't anything flashing up there.

"Q. Did you hear any bells or observe any flasher prior to the time that the car—

"A. (interrupting). No, sir."

[8] Defendant asserts that the crossing was visible for 1,200 feet. While this is true on a clear day, the testimony of the eyewitnesses adequately supports the conclusion that under the weather conditions at the time of the accident, it was barely possible to see the crossing from the crossroad only 135 feet away.

nighttime speed limit on US 23 in the area of the accident was 55 miles per hour, and testimony supports the trial court's finding of fact that O'Loughlin was driving between 50 and 55 miles per hour as he approached the crossing. In light of the testimony that the witnesses could "barely see the train" 135 feet from the crossing and the need of twice that distance to come to a safe stop, the significance of the absent warning lights becomes apparent.

The existence of a railroad crossing sign located 500 feet north of the crossing was not sufficient to put O'Loughlin on notice. Decedent was a resident of the area and had traveled this section of US 23 on many previous occasions. He was thus familiar with the electric flashing signal and had the right to rely on it. As noted in *Motyka* v. *Detroit, G. H. & M. R. Co.* (1932), 256 Mich 417, 418: "It was then a protected crossing. It is settled law, and it is common sense, that one may place some reliance on the protection afforded at the crossing.  *  *  *  If one may place no reliance on gates and flagmen, why have them." The existence of the standard crossbuck sign 500 feet from the crossing did not reduce the reliance O'Loughlin could place in the electric flasher. Indeed, in light of O'Loughlin's familiarity with the area, the crossbuck sign probably served as a warning to be on guard for the electric flasher.

Also, the fact that "he made no visible effort to avoid collision until he was 135 feet from the crossing" does not necessarily imply contributory negligence. O'Loughlin's car left skid marks starting 102 feet from the crossing. The evidence in the record concerning stopping distances and reaction time indicates that if O'Loughlin was going 50–55 miles per hour, he would have traveled 55–60 feet after he saw the train before he would have applied his brakes. Therefore, he probably saw the train

approximately 160 feet from the crossing. Considering the eyewitnesses could "barely see" it at a distance of 135 feet, O'Loughlin's reactions appear to have been reasonable.

We conclude, therefore, that sufficient evidence exists to support the trial judge's findings that considering the weather conditions prevailing on the night of the accident, the dark color of the train and the failure of the warning signal to operate, that neither O'Loughlin nor a reasonably prudent driver could have seen the train or had warning of it in time to avoid a collision. The record also supports the finding that the railroad knew or should have known that the electric signal was not properly functioning during a significant period preceding the accident.[9] Our review of the record convinces us that the trial court was not clearly in error in its basic findings of fact. *Hughson* v. *O'Reilly* (1967), 7 Mich App 324; *King* v. *Partridge* (1968), 9 Mich App 540, GCR 1963, 517.1 and 810(2).

Defendant asserts that this case is governed by our decision in *Music* v. *New York Central R. Co.* (1966), 2 Mich App 467. There defendant had been found by the trial court to have been driving recklessly as he approached a crossing, which he did not claim to be unusually dangerous, on a clear, dry night. In the instant case the eyewitnesses testified that O'Loughlin's speed did not seem excessive. Moreover, here the primary cause of the accident was the invisibility of the train at a distance where a safe stop was physically possible.

---

[9] Evidence was produced to the effect that the signal would sometimes come on and stay on for hours at a time when no train was approaching from either direction and that the railroad had to be called to send an employee to turn it off. There was also evidence that the signal would sometimes turn off prematurely and testimony indicating that during the year preceding the accident, members of the local railroad brotherhood had registered complaints that the flasher was not operating properly so as to allow traffic on US 23 to stop and avoid collisions with the trains.

On cross-appeal plaintiff attacks the reduction of the verdict from $100,000 to $88,000 by the trial court. The action was taken on the trial court's own motion. In its order reducing judgment,[10] the trial court stated:

"Defendant having moved for entry of judgment of no cause of action and in the alternative a new trial, this court on its own motion amends the judgment heretofore entered in the amount of $100,000 which was based on the court's understanding that the expert actuary witness had not included interest in his computation of loss of earning and that, therefore, income taxes which might have been payable on such earnings would be thus offset, and, thereafter the court on reviewing the actuary's testimony, believing that he did add interest, *therefore reduces the judgment by $12,000 or the estimated income taxes payable,* and over the objection of the plaintiff in open court." (Emphasis supplied.)

Defendant initially argues that the trial court merely corrected a clerical error, citing GCR 1963, 528.1. Our review of the record and the trial court's order reducing judgment, however, convinces us that the trial court made a substantive change in the judgment by considering the element of taxes, which it had not previously taken into consideration.

The issue raised by the parties is whether the finder of fact may take into account income tax consequences in figuring the size of the compensatory award to be made. A review of authority reveals

---

[10] The record also contains the following statement made by the trial court:

"The court of its own motion is going to modify this judgment and reduce the amount of the judgment by the amount that the court had determined as being income taxes attributable to the moneys which would have been earned by the deceased and this amount is in the sum of $12,000."

that the courts[11] and commentators[12] are badly split on the issue. The issue has not been decided in Michigan. Based on the record presented, however, it is not necessary to reach the issue and we, therefore, reserve judgment on the question.

No evidence was either admitted or offered to show what O'Loughlin's tax status would have been had he lived during the period between the accident and trial, or for the period following trial. Consideration of the effect of taxes, if it is to be allowed, may only be allowed when based upon facts and expert opinion properly brought into evidence. Just as the fact-finder must set its award according to an educated guess based on the facts presented at trial, so too, if the judgment is to be reduced it may only be done according to evidence presented.

As no evidence exists sufficient to support the trial court's reduction of the verdict, the reduction constitutes error. On remand the trial court will enter its order reinstating the original judgment.

Affirmed as modified and remanded for actions not inconsistent with this opinion. Costs to plaintiff.

All concurred.

---

[11] See generally, 63 ALR2d 1393, Annotation: "Propriety of taking income tax into consideration in fixing damages in personal injury or death action."

[12] 2 Harper and James, The Law of Torts, § 25.12 pp 1326–1327; Spangenberg: Wrongful Death and Survivorship.